22460. MANER *v.* THE STATE.

Decided September 1, 1932.

*John F. Echols,* for plaintiff in error.

*John A. Boykin,* solicitor-general, *J. W. LeCraw, John H. Hudson,* contra.

Luke, J. ■ The indictment in this case charges Dr. W. A. Maner with an "attempt to commit arson," in that, on March 10, 1930, in Fulton county, Ga., he "did . ꞏ attempt to set fire to

and burn the office fixtures located in the offices of accused on the second floor of the building known as Number 160 Hunter street, S. W. [here the indictment sets out the fixtures referred to], . . said personal property . . being insured against loss or damage by fire by the Baltimore American Insurance Company, . . and said attempt being made with intent to defraud the said insurer; said attempt to set fire to and burn said . . property being made by the accused in the following manner, to wit: Accused strewed excelsior along and upon boxes and containers and poured alcohol and gasoline over and upon the same, and accused stuck croker sacks under a roller-top desk and saturated the same with alcohol and gasoline, in said offices in said building, with intent thereby to set fire to and burn the said above designated personal property that was so insured as aforesaid against loss or damage by fire. . ."

The jury found the defendant guilty, with recommendation that the offense be treated as a misdemeanor; and his motion for a new trial being overruled, he excepted.

On the trial John Terrell, sworn for the State, testified that he went to Dr. Maner's place of business on March 10, 1930, and found Dr. Springer there. "We found the office littered up with some excelsior and sacks stuffed under the desk; . . those sacks are commonly known as gunny sacks, saturated with alcohol. . . There was some excelsior scattered on the floor, as well as on top of the table and counters, . . and some in a barrel, I believe. It was saturated with alcohol. . . I saw the defendant after that. He was brought to the fire-department office by two detectives, . . something like an hour after I had gone there and found his office in that condition. . . I talked to him about the condition of his office and the appearance of it, and what we understood he was trying to do—trying to burn his office. . . In the conversation he said that times were hard, and that he owed a good deal of money and was behind with his office rent and drug bill, and did not see how he could pay out, and he decided that the only way to do it was to have a fire and get his insurance. . . He said he had arranged this stuff in the office just previous to the time he was called down there. . . This material that I found there is inflammable. . . Gasoline is highly inflammable. Alcohol such as we found there is inflammable. . . Under the roll-top desk we found some sacks. They were saturated with what appeared to be alcohol. . . There

was probably two or three of those sacks that had alcohol on them, or more; anyway, they were shoved under the desk."

After describing the rooms used by the defendant in conducting his drug-manufacturing business, H. A. Guimarin, sworn for the State, testified in part as follows: "I noticed in the drug-room some trash and paper and excelsior, . . and over by the wall there was . . another barrel, containing petroleum products, and under this desk was some sacks. On the right was a table, and some boxes on the other side, and these had been saturated with some kind of inflammable fluid, . . denatured alcohol of some kind. . . I found one bottle that had been emptied. It was a one-gallon bottle. The odor of gasoline was in the bottle. . . The herb boxes were open, and he had paper boxes on top of the herb boxes, and trash and paper laid on top of them. . ."

Dr. H. L. Springer, sworn for the State, testified in part as follows: "I know Dr. Maner. . . I recall what happened over there . . about March 10, 1930. I got to the office that morning about 8:30 or 8:45. There was not anybody there when I got there. . . I was hired by Dr. Maner on a salary. . . About 11:20 I went to lunch. . . When I left Dr. Maner was there. . . Dr. Maner was there when I came back from lunch. . . I did not put those sacks under the desk. I did not scatter that excelsior there. . . I discovered that they were there when I came back from lunch. . . After the thing happened like it did, I called a friend of mine, Mr. Walthal. The thing that caused me to do that—the boxes and things were there, and . . it looked like something was wrong. There was paper and stuff over the excelsior. It was all lying around, and there were some barrels and boxes in that room, and this was on top of the barrels and boxes. No, I do not know who poured gasoline and alcohol on that; I did not. It was the discovery of the arrangement of the things that caused me to think that it looked like something was wrong. After I came from lunch he [defendant] sent me to Lamar & Rankin, and I was there possibly thirty minutes. . . When I got back nobody was in the office but Dr. Maner. . . Dr. Maner was burning this vaseline on the electric burner. . . He had some alcohol in a little cup or bucket with some camphor cut up in it, and he set this down on the table and poured the alcohol into the vaseline, and it blazed up, and there was some towels, and he

grabbed them and throwed them over the stuff. . . I did not discover that this gasoline and alcohol had been poured on the desk until the people got there. I did not see this stuff poured over the excelsior. There was probably a quart and a half of this stuff in that little cup. . . It was after he set it off the burner that he poured the alcohol in. . . He put it out. He grabbed some towels and some cloths. No, I don't think he grabbed a gunny sack. Some of it might have spilled on the table. I don't remember that he spilled any of it on the floor, but he might have done it. . ."

It next appears from the record that the defendant was carrying fire insurance in the sum of $1500 on his office furniture, fixtures, etc., at the time of the alleged attempt to commit arson. The record further discloses that he was considerably behind in his rent at that time.

The defendant introduced a cloud of reputable witnesses who testified that his character was good. He stated to the jury in effect that he had bought out the Durham Medical Institute, and was engaged in manufacturing and dispensing preparations for chronic diseases; that he was preparing a liniment when the mixture got too hot and caught fire and spilled on the floor; that he got some towels and a sack or two and scrubbed the floor, and "tucked them back under the desk;" that he spilled some of the mixture on the excelsior, and "maybe spilled some of it on the boxes in the excitement, . . but it did not any of it catch fire," and he "packed it away that way;" and that he did not make any confession to the witness Terrell. Recalled for the State, H. A. Guimarin swore: "I saw this excelsior and stuff in the drug-room in Dr. Maner's place. I handled it. I saw the pieces of paper. I saw two sacks. I handled them in taking them out. They were saturated."

We have not set out the testimony of all the witnesses, nor all the testimony of any witness. We think, however, that the main features of the case have been presented. It is contended by counsel for the plaintiff in error that the evidence fails to show an attempt to commit a crime. What constitutes an attempt to commit an offense has been fully discussed by the decisions of both the appellate courts of this State. In this connection see *Maner* v. *State*, 43 *Ga. App.* 772 (159 S. E. 902), and the cases there cited. It will be observed from the headnote in that case that the facts alleged

in the indictment to make an attempt to commit arson are practically the same as the facts set out in the present indictment. That headnote is as follows: "Strewing excelsior along and upon barrels and boxes, pouring alcohol and gasoline over and upon the same, putting croker sacks under a roller-top desk and saturating them with alcohol and gasoline, are overt acts, 'inexplicable as lawful acts,' 'tending to the commission of the crime' of arson. The indictment sufficiently alleged an attempt to commit such crime, and the court did not err in overruling the general demurrer thereto." We are satisfied that the evidence in the case at bar warrants the verdict, and hold that the trial judge did not err in overruling the general grounds of the motion for a new trial.

■ Special ground 1 avers that the court erred in allowing N. S. Rushin, bookkeeper of the defendant's landlord, to testify in effect that the defendant had gotten considerably behind in payment of his rent. The indictment alleges that the defendant committed the acts therein set out to defraud an insurance carrier. The witness Terrell testified in effect that the defendant had stated to him that he owed considerable money, and that the only way to pay it was to have a fire and get his insurance. We think that the evidence was admissible; but, even if it were not, other evidence to the same effect was admitted without objection. We refer to the ledger sheets showing the defendant's monthly account with his landlord. See *Smith* v. *State,* 23 *Ga. App.* 76 (3), 77 (97 S. E. 454); *Chapman* v. *State,* 28 *Ga. App.* 107 (3-a) (110 S. E. 332); *Brannan* v. *State,* 43 *Ga. App.* 231, 233 (158 S. E. 355).

■ It appears from special ground 2 that after Judge Virlyn B. Moore had testified to the good character of the defendant, counsel for the State propounded this question to the witness: "If you knew that he [the defendant] had told a friend of his, Chief Terrell, that he had spread excelsior and paper sacks and things over his office to have a fire because he was in a bad way financially, to burn up his office fixtures,—would that affect your opinion?" The witness replied, in effect, that this would affect his opinion of the character of the defendant. The objection was: "That does not go to a man's character. A man's character is general reputation in the community, and I object further on the ground that it is irrelevant and immaterial." The testimony was admitted. While the question was framed hypothetically, it was substantially based

upon testimony adduced upon the trial. See testimony of the witness Terrell. The witness had testified to the defendant's general good character. There had been testimony to the effect that the defendant himself had admitted that he had arranged to burn certain insured property in order to get the insurance money to enable him to pay certain pressing financial obligations. If the character witness had known of any such statement by the defendant, his opinion as to the latter's good character would most likely be changed. Indeed, the witness so testified. The headnote in the case of *Moulder* v. *State*, 9 *Ga. App.* 438 (71 S. E. 682), reads as follows: "Where character is put in issue, the direct examination must relate to general reputation, good or bad, as the case may be; but on cross-examination particular transactions, or statements of single individuals, may be brought into the inquiry, in testing the extent and foundation of the witness's knowledge and the correctness of his testimony on direct examination." We quote also from the decision as follows: "But when State's counsel comes to the cross-examination, he may inquire of the witness as to whom he has heard speak of the accused, as to what these persons said, and then, for the purpose of showing the incorrectness of the witness's statement that this good character which he has ascribed is general, may inquire if he has not heard particular persons speak ill of him, or if he has known him to be accused of particular crimes, or of particular acts which would tend to detract from a man's good character in the community." A decision which appears to be more concretely in point is in the case of *Stewart* v. *State*, 37 *Ga. App.* 386 (140 S. E. 415). The fifth paragraph of the decision in that case reads: "A witness who had testified to the good character of one of the defendants was asked on cross-examination, 'What do you think about a man's character that would help kill another man's hog, and help cover up the blood, and then help carry the hog to a negro's house, and butcher the hog in the negro's house, and receive for his services a shoulder of meat? What do you think about a man's character who would do a thing like that?' Over the objection of counsel for the defendant, the witness was allowed to answer the question, and said: 'Well, if he were to do what you outlined, I would say he was dishonest.' There was some evidence to support the statements incorporated in the foregoing question, and therefore the answer was properly allowed in evidence. . ." We hold

in the case at bar that the State was entitled to a thorough and sifting cross-examination of the character witness, and that the question propounded was proper and the evidence adduced admissible.

It appears from special ground 3 that a different witness was asked the same question as that set out in the foregoing ground, and that he gave practically the same answer to the question as did Judge Moore. Therefore we hold that there is no merit in this ground.

■ It is averred in special ground 4 that the trial judge erred in refusing to charge: (1) "In order to authorize a conviction of arson, it must appear from the evidence, to a reasonable and moral certainty, that the property was burned, or an attempt made to burn it by some criminal agency." (2) "The legal presumption in a case of arson is that the burning was the result of accident or providential cause, rather than of criminal design." (3) "The law presumes every fire to be accidental until the contrary appears." (4) "In cases of alleged arson or attempted arson, where nothing appears but the burning, the law presumes that the fire was the result of accident or providential cause, and the burden of proof is on the prosecution to overcome this legal presumption by evidence and beyond a reasonable doubt." While it appears that the request to charge was presented to the judge before the jury retired to consider its verdict, it is nowhere averred that said charge was "pertinent and applicable to the facts of the case." It has been repeatedly held that a ground of a motion for a new trial based upon the failure of the trial judge to give a requested charge is not in proper form for consideration where it is not alleged in the ground that such charge was pertinent and applicable to the facts of the case. See *Trammell* v. *Shirley*, 38 *Ga. App.* 710, 713 (145 S. E. 486), and cit. For a recent application of the rule, see *York* v. *State*, 42 *Ga. App.* 453 (33) (156 S. E. 733). This disposes of ground 4. However, we will say that the indictment charges an "attempt to commit arson," and not the completed offense of arson, and that the case, as we see it, hinges upon certain overt acts, and not upon the accidental fire which the defendant extinguished. Therefore we doubt the applicability of much of the requested charge to the case. "Where a series of propositions are presented en bloc in a single request to charge, the court is not required to give them or any part of them, if any one of them is erroneous or inapplicable

to the case on trial." *Western Union Telegraph Co.* v. *Owens,* 23 *Ga. App.* 169 (5) (98 S. E. 116). See also *Thompson* v. *O'Connor,* 115 *Ga.* 120 (5) (41 S. E. 242). It has been held that a requested charge "must contain a perfect statement of the law applicable to the question dealt with, to render it erroneous for the court to refuse to give it in charge to the jury." *Tanner* v. *State,* 161 *Ga.* 193, 198 (130 S. E. 64). As indicated above, we hold that this ground is not in proper form for consideration. However, we doubt if it discloses reversible error in any event.

■ The fifth, and last, special ground avers that the court erred in allowing counsel for the State to read to the jury the following excerpt from the decision in *Maner* v. *State,* supra: "We recognize, of course, that one may intend to commit a crime and do certain acts towards its consummation, and repent of his intention and refrain from his original purpose before the commission of the act; and that 'mere preparatory acts for the commission of a crime, and not proximately leading to its consummation, do not constitute an attempt to commit the crime . .' *Groves* v. *State,* 116 *Ga.* 516 (42 S. E. 755, 59 L. R. A. 598). The question for determination is, does the indictment allege such preparatory acts as 'proximately lead to the consummation of the crime?' We think it does." This ground recites: "At the time that counsel for the State, during his argument, read the above-named excerpt, movant, through his counsel, objected on the ground that it was not the right of the solicitor-general to read, in the hearing of the court and jury, a discussion by the reviewing court of facts in the case on trial as contained in an opinion delivered by the reviewing court when the same case was before it in a previous occasion. The judge overruled the objection offered, . . and allowed the solicitor-general to read the excerpt, and movant contends and alleges that this ruling of the court was error and contrary to law." The court's approval of the grounds of the motion for a new trial are in this language: "The grounds thereof are hereby approved, except as to ground 5 the court certifies: during the progress of the argument to the jury, the solicitor, while the court's attention was, for a moment, diverted, began reading the excerpt complained of. Before the reading had progressed very far the objection was made. The argument on that objection then continued, and the remainder of the excerpt, including the last sentence was then read to the court in the presence of the jury."

We do not think that the ground was properly and unqualifiedly approved. What part of said excerpt was read to the jury, and what part to the court in the presence of the jury, is doubtful. Furthermore, it does not appear that the facts in the case were read at all; and, when the last sentence eliminated by the judge in his approval of the grounds is stricken from the excerpt, it appears that the solicitor-general merely read to the jury well-seasoned law. In this view of the ground, we see no merit in the exception. However, should it be conceded that the ground was properly approved, and that the reading of the excerpt was harmful to the defendant, the ground discloses no reason for reversing the judgment, since no motion for a mistrial was made. See *Killabrew* v. *State,* 26 *Ga. App.* 231 (105 S. E. 711), where it was held: "There being no motion for a mistrial, the argument, even if improper and harmful to the defendant, was not ground for a new trial." See also *Brown* v. *State,* 150 *Ga.* 756 (3) (105 S. E. 289), where it was held: "The remarks of counsel made to the jury, which are complained of in the motion for a new trial, do not require the grant of a new trial, in view of the fact that no motion for a mistrial was made."

In conclusion, we hold that the evidence supports the verdict, and that the record discloses no reversible error.

*Judgment affirmed. Broyles, C. J., and Hooper, J., concur.*